IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ENDURANCE DEALER SERVICES, LLC, | ) ) ) | |
| Plaintiff, | ) ) | No. 26-cv-280 |
| v. | ) ) | Judge Jeffrey I. Cummings |
| ASCENT ADMINISTRATION SERVICES LLC, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Endurance Dealer Services, LLC ("Endurance") brings this suit against Ascent Administration Services LLC ("Ascent"), alleging trademark infringement in violation of the Lanham Act, 15 U.S.C. §1051, *et seq.* Before the Court is Endurance's renewed motion for a temporary restraining order ("TRO") and preliminary injunction. (Dckt. #21). For the reasons below, the Court grants plaintiff's motion for entry of a preliminary injunction.

I.      FACTS

A.      Endurance's Business

Endurance Warranty Services, LLC has advertised, sold, and handled claims related to vehicle services contracts ("VSCs"), also known as extended auto warranties, nationwide since 2006. (Dckt. ##1 ¶33; 22 at 6). Plaintiff Endurance, which was established in 2010, administrates any and all VSCs marketed and sold by Endurance Warranty Services, LLC. (Dckt. #1 ¶37). Endurance alleges that it and its affiliates are a "market leader in the marketing, sale, and administering of VSCs and ancillary products." (*Id.* ¶2). Endurance promotes its services under five federally registered and thirteen unregistered trademarks (the "Apex Trademarks"), all of which share the common word element "APEX" or "Apex," (*id.*), and

which Endurance "spends substantial time, money, and other resources developing, advertising, and otherwise promoting," (*id.* ¶39).

In particular, Endurance holds registered trademarks for "APEX PRO," "APEX PREMIER," "APEX SELECT PLUS," "APEX SELECT," and "APEX POWERWRAP" (the "Apex Registered Trademarks"). (Dckt. #22 at 6 n.1). Each of Endurance's Apex Registered Trademarks claims November 2010 as the date of first use in commerce and recites as a service: "Providing administration of extended service contracts, namely, extended warranty contracts on motor vehicles." (Dckt. ##1-2 to 1-6). On its website, Endurance advertises the Apex Registered Trademarks under its "APEX VSC PROGRAM." (Dckt. #1 ¶5). Endurance also claims thirteen unregistered trademarks for "Apex," "Apex EV," "Apex Xtra," "Apex Plus," "Apex Powersports," "Apex Unlimited Time," "Apex Credit Union," "Apex Certified VSC," "Apex Certified Limited Warranty," "Apex Euro," "Apex High Tech," "Apex 10/200 VSC Wrap," and "Apex 10/200 Limited Warranty" (the "Apex Unregistered Trademarks"). (Dckt. #22 at 6 n.1). Each of these marks was first used in commerce at some point between September 11, 2012 and December 1, 2025—nine marks between 2012 and 2021, two in October 2022, one in October 2023, and one in December 2025. (Dckt. #1 ¶6).

Endurance markets and sells its products nationwide, including in Illinois, in physical dealerships through local agents. (Dckt. ##10-13; 22 at 17). It also advertises its goods and services through social media, television ads, radio ads, celebrity endorsements, and search engine optimization strategies. (Dckt. ##1 ¶40; 10-12; 22 at 17).

### B. Ascent's Business

Like Endurance, Ascent advertises, sells, and handles claims related to VSCs nationwide. (Dckt. #1 ¶18). Ascent was incorporated in 2022. (*Id.* ¶9).

In or around February 2023, Ascent began crafting and marketing a product branded "APEX Commercial Vehicle Protection." (Dckt. #28-1 at 4). Rich Snaith, the president of Ascent, states that he directed the company to select the term "Apex" for this product "based on its common, descriptive connotation of premium or top-tier protection." (*Id.*). After eleven months of development, Ascent first sold contracts for "APEX Commercial Vehicle Protection" in or about January 2024. (*Id.*). The product is sold and directed solely to commercial and business clients. (*Id.* at 4–5). It is advertised and sold featuring the product name under an image of a mountain, copied below, (Dckt. #22 at 7):



Like Endurance, Ascent markets its products nationwide, advertises through social media, and sells its products through agents in physical dealerships. (Dckt. ##10-14 and 10-15; 22 at 17).

### C. Other Uses of Apex

Ascent identifies fourteen registered trademarks, owned by eleven different entities, that rely heavily upon the word "Apex" in their marketing or nomenclature related to auto repair and insurance. (Dckt. #28-1 at 13). One owner entity, "Apex Protection, Inc." ("API"), doing business as "Apex Protection Plan," provides VSCs and other coverage products to customers for their consumer vehicles through the same general marketplace channels as Endurance, including, *inter alia*, industry conventions. (*Id.* at 7–8).

3

In February 2016, after Endurance had applied to trademark "APEX SELECT" for the provision of VSCs, Endurance received a response from the United States Patent and Trademark Office that a likelihood of confusion existed between Endurance's sought-after trademark and API's trademark for "APEX PROTECTION PLAN" for the same product. (Dckt. #33-5 at 2–3). Because Endurance believed itself to be the superior rightsholder, it sought to cancel API's registration. (Dckt. #33 at 11). Ultimately, however, on July 27, 2016, the parties entered into a coexistence agreement in which Endurance agreed not to use "APEX" in combination with certain terms (including "PROTECTION" and "AUTO") and API agreed not to "nam[e] any warranty and service contract products with the term APEX following the same nomenclature identified herein and currently used by Endurance." (Dckt. #33-5 at 20–21).

Notwithstanding the coexistence agreement between Endurance and API, API has received calls from consumers expressing confusion between its offerings and Endurance's. (Dckt. #28-1 at 7).

### D.    Inquiries to Endurance

Endurance has received calls from market participants who have confused Ascent's products for its own. In particular, between 2025 and 2026, Endurance president Aaron Segal has received "multiple inquiries from dealers and agents" asking whether Ascent's products, branded "APEX," were associated with Endurance. (Dckt. #10-1 ¶¶4–6). These dealers and agents expressed "confusion and frustration" to learn that Ascent's products were not actually from Endurance, and indicated that Ascent's products had caused "significant confusion" among dealers and agents. (*Id.* ¶6). Segal also states that "[e]ach time Ascent makes a social media announcement regarding [Apex-branded] products and services," he "continue[s] to receive questions regarding Endurance's affiliation from agents and dealers." (*Id.* ¶19).

4

### E.  Recruiting Matthew Brady

As separate support for its allegations that Ascent was on notice of Endurance's use of "Apex" for its VSC trademarks, Endurance alleges the following about certain recruiting efforts the company made in 2024.  On May 6, 2024, Endurance president Segal received the resume of Matthew Brady from Brady's personal Gmail account.  (Dckt. #10-1 ¶13).  In the process of recruiting Brady to work for Endurance, between May 14 and May 19, 2024, Segal shared with him Endurance's branding guidelines, which included detailed descriptions of Endurance's Apex Trademarks and related products.  (*Id.* ¶13).  Endurance ultimately offered employment to Brady, but at the beginning of June 2024, Brady informed Segal that he had received an offer from Ascent that he would be accepting instead.  (*Id.* ¶15).  That role was for National Sales Director, beginning July 2024, in which position Brady was responsible for product development.  (*Id.* ¶16).  After Brady declined Endurance's offer of employment, Segal informed Brady to keep all the information he had been provided throughout the recruitment process confidential.  (*Id.* ¶15).

## II.  PROCEDURAL BACKGROUND

Endurance alleges that it learned of Ascent's use of "APEX Commercial Vehicle Protection" at least as early as September 2025.  (Dckt. #1 ¶55).  After discovering that Ascent was using that mark to advertise, market, promote, and sell VSCs, Endurance sent a cease-and-desist letter to Ascent on September 25, 2025.  (Dckt. ##1-7; 22 at 7).  On October 2, 2025, Ascent acknowledged receipt of Endurance's cease-and-desist letter.  (Dckt. ##1 ¶57; 1-8 at 2).  Over the next month, Endurance made subsequent unsuccessful attempts to discuss the alleged infringement with Ascent.  (Dckt. #1-8 at 2–4).  Nonetheless, Ascent continued—and continues—to use its "APEX Commercial Vehicle Protection" mark to market and sell its associated product.  (Dckt. #22 at 8).

5

Endurance brought this suit on January 9, 2026.  (Dckt. ##1; 22 at 7).  Shortly thereafter, on January 12, 2026, Endurance moved for leave to file an oversized brief in support of its motion for TRO and preliminary injunction, which it subsequently did.  (*See* Dckt. ##8–10).  After Endurance filed its motion for injunctive relief, the parties contacted the Court to indicate that they believed this matter could be resolved without further litigation.  (Dckt. #14).  The Court granted defendant an extension of time to respond to plaintiff's motion accordingly, and by January 28, 2026, the parties had "agree[d] in principle to resolve the matter."  (Dckt. #16).  The parties' March 2, 2026 joint status report indicated that the parties believed that they could finalize settlement within thirty days.  (Dckt. #18).  Nonetheless, Endurance expressed an interest in renewing its prior motion for TRO and preliminary injunction.  (Dckt. #19).  Ascent responded that it was "actively working on rebranding" pursuant to the parties' settlement agreement.  (*Id.*).

On March 27, 2026, Endurance filed a renewed motion for TRO and preliminary injunction, also oversized, which is now before the Court.  (Dckt. #21).  As before, Endurance seeks entry of a TRO and preliminary injunction enjoining the "manufacture, distribution, offering for sale, and sale of infringing products."  (*Id.* at 1).  In support of its motion, Endurance has submitted declarations from company president Aaron Segal, a declaration from counsel of record Joseph Kuo, and various exhibits.  (*See* Dckt. ##10-1 to 10-18; 33-1 to 33-7).  In support of its memorandum in opposition, Ascent has submitted a declaration from company president Rich Snaith, a list of "Apex Trademarks for Insurance and Automotive Repairs," and various other exhibits, including records of the coexistence agreement negotiated between Endurance and Apex Protection.  (*See* Dckt. ##28-1).

6

### III.    LEGAL STANDARD

A preliminary injunction may be granted where a movant shows that (1) it is "likely to succeed on the merits of its claims" and (2) "that traditional legal remedies would be inadequate, such that it would suffer irreparable harm without injunctive relief." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 843 (7th Cir. 2023). With respect to the likelihood of success on the merits, the moving party "need not show by a preponderance of the evidence that [it] will win [its] suit." *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021). Nonetheless, "the mere possibility of success is not enough" and the movant "must demonstrate at a minimum how it proposes to prove the key elements of its case." *Grubhub*, 80 F.4th at 844; *see also Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021) ("We recently clarified that a plaintiff must demonstrate that its claim has some likelihood of success on the merits, not merely a better than negligible chance.") (cleaned up).

If the moving party makes this threshold showing, the court moves to the balancing phase, where the court "weighs the harm of denying an injunction to the [movant] against the harm to the [opposing party] of granting one." *Life Spine*, 8 F.4th at 549 (citing *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)). This is done using a "sliding scale": "the greater the movant's likelihood of success on the merits, the less the harms need be in its favor." *Grubhub*, 80 F.4th at 844. In balancing the harms, the court also considers the public interest in granting or denying the injunction. *Id*; *Life Spine*, 8 F.4th at 539; *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). In doing so, the "question is not whether the public interest will be served, but whether the public interest will be disserved" if the injunction is granted. *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 866–68 (7th Cir. 1983) (emphasis in original).

## IV.    ANALYSIS

### A.  Likelihood of Success on the Merits

Endurance's claims for trademark infringement arise under the Lanham Act, which provides in relevant part that a plaintiff may bring a civil action against:

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . [which] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. §1125(a)(1).  To succeed on its trademark infringement claim, Endurance must show that (1) it owns a valid, protectable trademark and (2) there is a likelihood of confusion caused by Ascent's use of the disputed mark.  *Grubhub*, 80 F.4th at 844.

### 1.    Endurance Is Likely to Show That It Owns Valid, Protectable Trademarks.

The parties agree that Endurance's registered trademarks are presumptively valid, but they dispute the validity of the unregistered trademarks.  (Dckt. #28 at 8).  Endurance argues that its unregistered trademarks have "acquired distinctiveness through widespread use and advertising."  (Dckt. #22 at 11).  Ascent, on the other hand, contends that "Apex" is descriptive and that Endurance has not established that the term has secondary meaning.  (Dckt. #28 at 8).  In the alternative, the parties dispute whether Endurance has a family of Apex Trademarks upon which Ascent's mark infringes.  (Dckt. ##22 at 11–12; 28 at 7–9).

Endurance could bring a claim of trademark infringement based upon its valid, protectable Apex Registered Marks alone.  Nonetheless, the Court considers the parties' arguments addressing the validity of the Apex Unregistered Marks.  The Court finds that, for the reasons that follow, Endurance is likely to succeed in showing that it owns valid, protectable marks in the Apex Unregistered Marks.

8

**a.** **Endurance Is Likely to Show That the Apex Unregistered Marks Are Suggestive.**

"[T]rademark ownership is not acquired by federal or state registration, but rather from prior appropriation and actual use in the market." *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 665 (7th Cir. 2016) (cleaned up); *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015). An unregistered mark can thus form the basis of a trademark infringement claim where a plaintiff demonstrates that the mark is sufficiently distinctive to warrant protection. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). A mark may be (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Two Pesos*, 505 U.S. at 768. Fanciful, arbitrary, or suggestive marks are deemed inherently distinctive and entitled to protection; generic marks are not entitled to protection; and descriptive marks are only distinctive enough to warrant protection if they have acquired "secondary meaning in the collective consciousness of the relevant community." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998) (cleaned up).

"A mark is descriptive when 'it describes the product category to which the brand belongs.'" *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 420 (7th Cir. 2019), *quoting Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 483 (7th Cir. 2007). A suggestive mark, on the other hand, "requires the observer or listener to use imagination and perception to determine the nature of the goods." *G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 996 (7th Cir. 1989). Courts employ two tests to distinguish a suggestive mark from one that is merely descriptive. First, courts consider "how, and how often, the relevant market uses the word in question." *Uncommon*, 926 F.3d at 421; *see also Bliss Salon Day Spa v. Bliss World LLC*, 268 F.3d 494, 497 (7th Cir. 2001); *Platinum Home Mortg.*, 149 F.3d at 730. Where a word's use in the relevant market is "undisputed and prevalent," it typically lacks inherent

9

distinctiveness. *Uncommon*, 926 F.3d at 422. Second, courts employ the so-called "degree of imagination test": "[I]f the mark imparts information directly it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992); *see also Uncommon*, 926 F.3d at 422; *Platinum Home Mortg.*, 149 F.3d at 727.

Under both tests, the "Apex" trademark is suggestive, and not descriptive. The term "Apex" is not in common use in the market for VSCs. Ascent makes much of the existence of thousands of "Apex" trademarks, specifically fourteen trademarks it identified that use the word "Apex" for "auto repair and insurance." (*See* Dckt. ##28 at 2, 9–12; 28-1 at 13). However, these marks exist in a market far broader than the market at issue here for extended auto warranties. Moreover, the record discloses that only one other entity has used "Apex" when selling VSCs: Apex Protection, Inc. (Dckt. #28 at 2). The fact that Endurance entered into a coexistence agreement with that very entity, establishing that only Endurance could use "Apex" in association with VSCs, makes the mark more distinctive, not less. *Cf. SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 599 (7th Cir. 2019) ("[W]idespread industry use, coupled with Gatorade's disclaimer of exclusive use of 'The Sports Fuel Company,' supports Gatorade's argument it used 'Sports Fuel' descriptively."). Distinctiveness is especially notable here because Endurance has been using "Apex" continuously in commerce for over a decade. Unlike the use of the word "platinum" in the financial services industry, "bliss" in the beauty care industry, or "capsule" in the cellphone case industry, "apex" is not a common, let alone "undisputed and prevalent," descriptor of extended auto warranties. *Cf. Platinum Home Mortg.*, 149 F.3d at 727–28; *Bliss*, 268 F.3d at 497; *Uncommon*, 926 F.3d at 421–22.

10

"Apex" is also suggestive under the degree of imagination test. Understanding exactly what services Endurance provides with products containing the term "Apex" requires a leap of imagination. Although defendant asserts that the term merely describes a quality of Endurance's products and services, "[a] reasonable consumer would not immediately think of [vehicle service contracts] when hearing the word '[Apex]'." *Kastanis v. Eggstacy LLC*, 752 F.Supp.2d 842, 850 (N.D.Ill. 2010); *see also Life After Hate, Inc. v. Free Radicals Project, Inc.*, 410 F.Supp.3d 891, 903–04 (N.D.Ill. 2019).

Moreover, even if Endurance's unregistered trademarks were merely descriptive, and not suggestive, the mark has established secondary meaning in the relevant market. A secondary meaning is "a link in the minds of consumers between the marked item and its source." *Uncommon*, 926 F.3d at 424. Courts can look to "amount of advertising, sales volume, length and manner of use, or consumer testimony" to evaluate whether secondary meaning exists. *Id.*; *Platinum Home Mortg.*, 149 F.3d at 728. Here, Endurance has used unregistered trademarks containing "Apex" for VSCs continuously and undisputedly for over a decade, and has recently received "multiple inquiries" confusing Ascent's "Apex" products for Endurance's. (*See* Dckt. #22 at 9, 15). Indeed, it is even the case that another company is receiving inquiries about "Apex"-branded products that consumers believe to be Endurance's. (*See* Dckt. #28-1 at 7). Moreover, Endurance has spent substantial time, money, and other resources over the years to advertise and promote its services under its Apex Trademarks. This is enough to establish secondary meaning.

b. **Endurance Is Likely to Show That a Family of Marks Exists.**

Even if its Apex Unregistered Marks are not distinctive, Endurance argues, they (along with the Apex Registered Marks) belong to a "family of marks" that is valid and protectable.

11

Ascent argues, to the contrary, that no family of marks exists, and that any family is insufficiently distinctive to receive trademark protection. (Dckt. #28 at 7–9).

A family of marks is "a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 814 (7th Cir. 2002); *see also J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed.Cir. 1991). "A family of marks exists only if and when 'the purchasing public recognizes that the common characteristic is indicative of a common origin of the goods.'" *AM Gen. Corp.*, 311 F.3d at 814, *quoting Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1336 (Fed.Cir. 2001). "Whether a family of marks exists is an issue of fact based on the common formative component's distinctiveness, the family's use, advertising, promotion, and inclusion in [the] party's other marks." *AM Gen. Corp.* at 815. "Use of the common formative component in only a few products weighs against a finding of a family." *Id.* (citing *Creamette Co. v. Merlino*, 299 F.2d 55, 58–59 (9th Cir. 1962)).

Here, it is likely that Endurance can show that its products belong to a family of marks united by the common term "Apex." All of the registered and unregistered marks that Endurance identifies as part of its VSC business contain the word "Apex." (Dckt. #22 at 6 n.1). Endurance has employed these marks continuously in commerce nationwide since, for some of its marks, as early as 2012. (*Id.* at 9). And dealers and agents of Endurance have expressed actual confusion about whether Ascent's Apex products belonged to Endurance. (*Id.* at 15); *see AM Gen. Corp.*, 311 F.3d at 815 ("Likelihood of confusion may be a significant component in determining whether a family of marks exists."). And as mentioned earlier, Ascent points out that at least one other company, API, which provides VSCs and uses the term "Apex" in its company name, *also*

12

receives calls from consumers expressing confusion between its offerings and Endurance's, even concerning products that are not VSCs. (Dckt. #28-1 at 7). This increases the likelihood that Endurance can show that the purchasing public recognizes "Apex"—the common element of all its own marks, at least one of Ascent's marks, and API's company name—as indicative of a common origin. *See J & J*, 932 F.2d at 1463 (survey evidence of actual confusion that "McPRETZEL" originated with McDonald's supported a conclusion that McDonald's owned a family of marks containing the "Mc" formative combined with a generic name).

Defendant's argument that no family of marks exists because customers only associate "Apex" marks with Endurance in the *consumer* vehicle market, and not the commercial vehicle market, is unavailing. "[C]ross-market recognition" is not a requirement for either the existence of a family of marks or trademark protection generally—especially where, as here, Endurance's registered trademarks concern "extended warranty contracts on motor vehicles," with no distinction between consumer and commercial markets, and where Endurance provides both consumer and commercial VSCs. (Dckt. ##28 at 7; 1-2 to 1-6).

Finally, Ascent argues that even if a family of marks does exist with the common component "Apex," that term is merely descriptive, and thus the family is not subject to protection under the Lanham Act. For the reasons described above in Section IV.A.1.a., the Court finds that Endurance is likely to show that "Apex" is a suggestive term in the context of VSCs. Moreover, "[a] family of marks is stronger than a single mark because, by definition, 'a group of marks hav(e) a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner.'" *Lettuce Entertain You Enterps., Inc. v. Leila Sophia AR, LLC*, 703 F.Supp.2d 777, 788 (N.D.Ill. 2010), *quoting AM Gen. Corp.*, 311

F.3d at 814 (cleaned up). Thus, the existence of a family of marks using the term "Apex" makes it even likelier that Endurance could demonstrate that its Apex Unregistered Marks are suggestive, rather than merely descriptive.

Accordingly, the Court finds that Endurance's Apex Unregistered Marks are valid and protectable.

### 2. Endurance Is Likely to Show a Likelihood of Confusion Caused by Ascent's Use of the Disputed Mark.

Next, the Court considers whether Endurance is likely to show a likelihood of confusion caused by Ascent's use of its allegedly infringing mark.

Likelihood of confusion exists when consumers "who might use either product or service would likely attribute them to a single source." *GrubHub*, 80 F.4th at 847 (cleaned up), *quoting Uncommon*, 926 F.3d at 425. Consumer confusion "need not be restricted to a mistake regarding the source of the goods; the court should also consider whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product." *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1228–29 (7th Cir. 1993).

In the Seventh Circuit, courts consider the following seven factors when determining whether a likelihood of confusion exists: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to pass his product off as that of another. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015); *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043–44 (7th Cir. 2000). "Courts may assign varying weight to each of the factors depending on the facts presented, though usually the similarity of the

marks, the defendant's intent, and actual confusion are particularly important." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008).

### a.  The Similarity Between the Parties' Marks

The first factor in the likelihood of confusion analysis considers the similarity between the marks.  "The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail." *Grubhub*, 80 F.4th at 848, *quoting Est. of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545–46 (1920).  That being said, "if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." *Ty*, 237 F.3d at 898.  The Court compares the marks "in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *AutoZone*, 543 F.3d at 930 (cleaned up).  To that end, "the test is not whether the public would confuse the marks, but whether the viewer of [a] mark would be likely to associate the product or service with which it is connected with the source of products or services with which [another] mark is connected." *GrubHub*, 80 F.4th at 848; *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976).

Ascent does not dispute that its mark contains the same term "Apex," stylized in all-caps, that is in all of Endurance's Apex Trademarks.  Nonetheless, it asserts that this factor weighs in its favor because its mark contains additional design elements, including "a mountain logo" and the "distinguishing terms 'Commercial Vehicle Protection,'" that create "visual distinction from Endurance's word-only marks." (Dckt. #28 at 5, 14).  Ascent's argument is unpersuasive.

The Court finds that the similarity of the marks weighs in favor of Endurance.  While the Court considers the marks as a whole, the word "Apex" is the salient portion of both Endurance's family of marks and Ascent's mark.  The words "Commercial Vehicle Protection" do appear in Ascent's mark, but in "significantly smaller font"; "Apex" takes up the majority of the space in

15

the logo. *Chi. Tribune Co. v. Fox News Network, LLC*, 520 F.Supp.2d 930, 934 (N.D.Ill. 2007). Indeed, the fact that Endurance's marks contain only words, and no additional design elements, increases the odds of confusion: with no visual comparator contained in Endurance's marks, a reasonable consumer is more likely, not less, to think that Ascent's products might be associated with Endurance's.

Furthermore, "[i]t is 'inappropriate to focus on minor stylistic differences to determine if confusion is likely' if the public does not encounter the two marks together." *Ty*, 237 F.3d at 898, *quoting Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997). When placed side by side, it is possible that Ascent's "APEX Commercial Vehicle Protection" mark would appear dissimilar from Endurance's Apex Trademarks. But—with perhaps the rare exception of an industry convention, where each booth definitionally belongs to a separate company, (*see* Dckt. #28 at 12)—consumers are not typically placing the companies' marks side by side and noting that one company's logo differs from the logo of the other company.

In sum: "Apex" contains "the first letters consumers see and the first sound consumers hear" when discussing the extended auto warranties provided by both Endurance and Ascent. *Corbond Corp. v. Core Foam, Inc.*, 356 F.Supp.2d 910, 916 (W.D.Wis. 2005). As such, "in light of what happens in the marketplace," *AutoZone*, 543 F.3d at 930, "Apex" is the salient aspect of both companies' marks. Thus, the similarity of the marks favors Endurance.

> **b.** **The Similarity of the Products, the Area and Manner of Concurrent Use, and the Degree of Care Likely to Be Exercised by Consumers**

Plaintiff argues that Endurance and Ascent offer identical products distributed through the same channels and used in the same manner. (Dckt. #22 at 16–17). Defendant, to the contrary, argues that because Endurance and Ascent target two different populations with their APEX products—the former targeting consumer vehicles, and the latter exclusively targeting

16

commercial vehicles—they offer different products, in different markets, to audiences exercising differing degrees of care. (Dckt. #28 at 4–6, 14).

With respect to both the similarity of the products and their area and manner of concurrent use, Ascent's arguments are, once more, unavailing. As Endurance notes: (1) both Endurance and Ascent offer VSCs for both commercial and consumer vehicle markets; and (2) Endurance's trademarks are for VSCs generally, not for consumer vehicles in particular. (*See* Dckt. #33 at 6–7). "Modern trademark law prohibits [infringement] not only on products that are in direct competition . . . but also on products that are considered to be 'closely related,'" including those which would "reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Sands*, 978 F.2d at 958 (cleaned up), *quoting Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1089 (7th Cir. 1988). Accordingly, "[a] likelihood of confusion may exist even if the parties are not in direct competition . . . or their products and services are not identical." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 679 (7th Cir. 2001). A consumer would readily and reasonably assume that Endurance might offer its "Apex"-marked products or services for either commercial or consumer VSCs—in part because, in fact, it does. Thus, a reasonable consumer is likely to be confused about the origin of Ascent's commercial VSCs. The similarity of the products weighs in strong favor of Endurance.

So, too, does the factor of concurrent use. This factor considers whether there is a "relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Ty*, 237 F.3d at 900, *quoting Forum Corp. of N. Am. v. Forum*, 903 F.2d 434, 442 (7th Cir. 1990). Courts take into account "whether the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures." *Sorenson*, 792 F.3d at

730.  Here, both Endurance and Ascent market their products nationwide, advertise through social media, and sell their products through agents in physical dealerships.  (Dckt. #22 at 17).  Moreover, both parties market and sell their products to both individual consumers and commercial purchasers.  (Dckt. #33 at 7).  Even if, as Ascent argues, its particular mark does not target individual consumers, the broader overlap between plaintiff and defendant's means and channels of commerce weighs strongly in favor of Endurance.

Finally, the degree of care likely to be exercised by consumers weighs slightly in favor of Endurance.  "The degree of care likely to be exercised by consumers is determined by considering several factors, including the expense of the product and the sophistication of the purchasers."  *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F.Supp.2d 503, 517 (N.D.Ill. 2011) (citing cases); *Uncommon*, 926 F.3d at 426.  In assessing this factor, the Court must consider "both parties' potential customers," *CAE*, 267 F.3d at 682, and where "consumers use a lesser degree of care, this supports a finding that there is a likelihood of confusion."  *Sorenson*, 792 F.3d at 730.  Here, even if (as Endurance disputes) Ascent's "Apex" product is in fact purchased only for commercial vehicles, *Endurance* provides "Apex"-marked products for both consumer and commercial vehicles.  (Dckt. #33 at 6–7).  Ascent itself contends that consumer VSC purchasers are less likely to exercise the "sophistication, business acumen and care" of commercial VSC purchasers.  (Dckt. #28 at 6).  Without further evidence about "the expense of the product and the sophistication of the purchasers," *Bobak Sausage*, 805 F.Supp.2d at 517, the Court finds that this factor weighs in favor of Endurance, although only slightly, given that both Endurance and Ascent sell the same type of product to a group of consumers (namely, consumer VSC purchasers) who exercise a lesser degree of care in selecting this type of product.

### c. The Strength of Endurance's Mark

"The 'strength' of a mark usually refers to its distinctiveness." *Uncommon*, 926 F.3d at 426. "The stronger a mark, the more one is likely to associate similar marks and products with it." *AutoZone*, 543 F.3d at 933; *Am. Soc'y of Plumbing Eng'rs v. TMB, Pub., Inc.*, 109 Fed.Appx. 781, 789 (7th Cir. 2004). In assessing the strength of a mark, courts consider: (1) its type (namely, whether it is generic, descriptive, suggestive, arbitrary, or fanciful); (2) whether it has been subject to wide and extensive advertising or use by the holder; or (3) a combination of both. *TMB*, 109 Fed.Appx. at 789.

This factor, too, weighs in favor of Endurance. As described above in Section IV.A.1.a., Endurance is likely to show that its Apex Trademarks are suggestive. Endurance is also likely to show that there exists a family of marks, *see* Section IV.A.1.b., which is stronger than any of its individual registered or unregistered marks alone. *See Lettuce Entertain You*, 703 F.Supp.2d at 788. Certain of the Apex Trademarks have been in use since 2012, and Endurance has successfully registered five trademarks featuring the term "APEX." This longstanding, continuous, and uncontested use of the Apex Trademarks indicate that this factor weighs in favor of Endurance. *See Illinois Tamale Co., Inc. v. LC Trademarks, Inc.*, 164 F.4th 648, 656 (7th Cir. 2026) ("[A]n incontestable registered mark—one that has been in continuous use for five years after registration—attains an even higher status of legal protection.").

Ascent argues that the existence of other registered trademarks containing the word "Apex," and specifically Endurance's coexistence agreement with API, makes Endurance's marks weak. (Dckt. #28 at 9–13). But for the same reasons discussed above, Ascent's arguments fall short: the coexistence agreement *strengthens* the exclusive association of "APEX" with VSCs, and Ascent identifies trademarks from a far broader market than the relevant market for VSCs. *See* Section IV.A.1.a. In fact, as Ascent itself points out, Endurance's family of Apex

19

Trademarks is so strong that API receives calls from consumers confusing its offerings and Endurance's. (Dckt. #28-1 at 7). The limited use of the term "Apex" in connection with VSCs, and the strong association of that term with Endurance in the VSC market, indicates the likely strength of the mark, not its weakness.

Accordingly, this factor weighs in favor of Endurance.

### d. Actual Confusion

"Evidence of actual confusion . . . is not essential to a finding of a likelihood of confusion, but where present it 'is entitled to substantial weight.'" *Grubhub*, 80 F.4th at 852, *quoting CAE*, 267 F.3d at 685. Indeed, even "[o]ne instance of actual confusion has been deemed sufficient to weigh in favor of finding a likelihood of confusion." *CAE*, 267 F.3d at 686; *Wesley-Jessen*, 698 F.2d at 867. While "instances of confusion that are not attributable to the applicable consumer group are entitled to *less* weight" than instances of consumer confusion, they are still relevant to the Court's likelihood of confusion analysis. *Grubhub*, 80 F.4th at 852 (emphasis added). This is because "non-consumer confusion can serve as a proxy for consumer confusion," particularly where actual confusion arises among, *inter alia*, "non-consumers whose confusion could create an inference that consumers are likely to be confused" or "whose confusion could influence consumers." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012).

Here, the parties identify three sources of confusion. First, Endurance president Aaron Segal states that "in the past few months" prior to January 2026, he received "multiple inquiries from dealers and agents regarding whether products and services being sold nationwide" were Endurance's rather than Ascent's. (Dckt. #10-1 ¶4). Second, Segal states that "[e]ach time Ascent makes a social media announcement regarding [Apex-branded] products and services," he "continue[s] to receive questions regarding Endurance's affiliation from agents and dealers."

20

(*Id.* ¶19).  Third, Ascent president Rich Snaith states that API—the party with which Endurance entered into a coexistence agreement—has received "calls from consumers" expressing confusion between its offerings and Endurance's.  (Dckt. #28-1 at 7).

All told, this evidence of actual confusion weighs in favor of Endurance.  As a preliminary matter, the "dealers and agents" from which Segal received inquiries are, in certain instances, the relevant consumers of Endurance or Ascent's products.  Ascent asserts that its "APEX Commercial Vehicle Protection" product "is marketed and sold exclusively through business-to-business channels, including dealers, agents, and commercial fleet purchasers." (Dckt. #28-1 at 5).  Once more, as Endurance points out, both Endurance and Ascent provide commercial VSCs.  (Dckt. ##33 at 6–7; 33-1 to 33-3).  As it pertains to those sales, then, the confusion of dealers and agents *is* the "actual consumer confusion" that the Court considers when evaluating the actual confusion factor in its likelihood of confusion analysis.  *See Platinum Home Mortg.*, 149 F.3d at 729 ("Evidence of actual confusion must refer to the confusion of reasonable and prudent consumers, and not confusion among sophisticated members of the [relevant] industry.").  The existence of *any* consumer confusion means that this factor weighs in favor of Endurance, *see CAE*, 267 F.3d at 686, but Segal's affirmation of "multiple inquiries" makes the likelihood of confusion even higher.  Indeed, "it is reasonable to infer from existence of a number of customers who *did* reach out to Endurance . . . that there were others who did not do so."  *Endurance Warranty Servs., LLC*, v. *Nationwide Autoprotect, LLC*, No. 26 C 3622, 2026 WL 1632525, at *2 (N.D.Ill. June 7, 2026).

Ascent contends that dealers and agents are not Endurance's customers, and that their confusion is not "actual consumer confusion."  (Dckt. #28 at 14).  Nonetheless, dealer or agent confusion is still relevant to the Court's analysis.  "[C]onfusion on the part of a sophisticated

21

nonconsumer may reasonably signal that less sophisticated consumers would also be confused." *Rearden*, 683 F.3d at 1216. "[T]he fact that those in the relevant industry express confusion . . . is at least probative of whether that similarity has also engendered confusion among consumers." *Urbanride, Inc. v. Urban Worldwide, Inc.*, No. 23-CV-6999 (JAV), 2026 WL 880256, at *5 (S.D.N.Y. Mar. 31, 2026). In other words, if even sophisticated industry members are confused by Ascent's use of the allegedly infringing mark, the likelihood of customer confusion is high—especially where, as Ascent itself admits, certain of Endurance's consumers are individual consumers who exercise even less "business acumen and care" than commercial VSC purchasers. (Dckt. #28 at 6); *see Oasis Legal Fin. Operating Co., LLC v. Chodes*, 454 F.Supp.3d 724, 731 (N.D.Ill. 2020) ("If evidence of industry confusion can serve as a proxy for consumer confusion, plaintiff's evidence does just that.").

It is particularly relevant that Segal receives complaints and questions from dealers and agents in the immediate aftermath of Ascent's social media announcements, and that he only notes receiving such complaints beginning in 2025. This timing is likely to support a finding that such instances of confusion are not isolated, sporadic, or de minimis, and instead relate directly to the overlap of Ascent and Endurance in the relevant VSC market. *See Express Funding, Inc. v. Express Mortg., Inc.*, 894 F.Supp. 1095, 1103 (E.D.Mich. 1995) ("Because these incidents of confusion involved individuals apparently well acquainted with the [relevant] industry and do not appear to be isolated incidents of confusion between commonly distinguished parties, they constitute strong evidence of a likelihood of confusion.").

Confusion on the part of dealers and agents—parties that are integral to VSC sales for both Endurance and Ascent, (*see* Dckt. ##10-13 to 10-15; 28-1 at 3, 5–6)—is relevant for the additional reason that confusion on the part of those intermediaries is likely to increase the odds

22

of end-customer confusion for individuals purchasing consumer VSCs. Dealers and agents interact directly with consumers, and therefore have the opportunity to "influence consumer perceptions and decision-making." *Rearden*, 683 F.3d at 1216. The inquiries that Segal received from dealers and agents weigh in favor of finding a likelihood of confusion because these partners are "non-consumers whose confusion could influence consumers." *Id.* at 1214.

Finally, although evidence of confusion with API's products does not concern confusion about Ascent's products, it *does* concern confusion about the salient feature in Endurance's family of marks: the term "Apex," the same element of Endurance's product that plaintiff alleges Ascent infringes. The existence of consumer confusion between Endurance's products and other Apex-branded items suggests that Endurance will likely be able to show a likelihood of confusion caused by Ascent's use of the term "Apex" in its marketing for VSCs.

The factor of actual confusion thus weighs in favor of Endurance.

### e. Evidence Regarding Ascent's Intent

Finally, the Court considers intent, and finds that this factor weighs slightly in Endurance's favor. In support of its argument that Ascent intended to palm off its goods as Endurance's, Endurance argues that (1) Ascent had longstanding knowledge of Endurance's marks and (2) Ascent has continued to use its "APEX" mark despite plaintiff's cease-and-desist letter and subsequent suit. (Dckt. ##22 at 14–15; 33 at 10–11). Ascent, in response, argues that its continued use of "APEX" was not evidence of bad faith or intent, but consistent with a good-faith business decision. (Dckt. #28 at 14–15).

A defendant's "mere knowledge" of a plaintiff's mark, without other evidence of subjective bad faith, is insufficient to show intent. *SportFuel*, 932 F.3d at 600. Nor is it dispositive that a defendant continues to use the allegedly infringing mark even after a plaintiff brings suit, for "it is lawful to use a mark that does not infringe some other . . . a defendant's

23

intentional use of a mark that it had every right to use is not itself a ground on which to draw an adverse inference." *Id.* at 600–01 (cleaned up), *quoting M-F-G Corp. v. EMRA Corp.*, 817 F.2d 410, 412 (7th Cir. 1987). But "where it can be shown that [a] junior user culpably disregarded the known rights of [a] senior user when adopting its own mark, such evidence can support an inference of consumer confusion." *Grubhub*, 80 F.4th at 857. Such a circumstance might arise where, for example, the junior user "knew of the mark, should have known of the mark, intended to copy the senior, [or] failed to conduct a reasonably adequate trademark search." *Id.*, *quoting Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1168 (9th Cir. 2021) (cleaned up).

Here, Endurance has adequately asserted that Ascent knew or should have known about the Apex Trademarks when developing and then using its own mark. Endurance highlights its use of the Apex Trademarks for over a decade, the fact that Ascent's current National Sales Director was shown Endurance's mark as early as May 2024, and Endurance's own market dominance ("Endurance and its affiliates are one of the largest providers of [VSCs] in the nation."). (Dckt. #22 at 6, 10, 14). Ascent fails to rebut this evidence that it culpably disregarded the rights of Endurance, the senior user. This factor thus weighs, slightly, in plaintiff's favor.

Accordingly, taken as a whole, all seven factors in the likelihood of confusion analysis weigh in favor of Endurance.

## V.      Irreparable Harm

To obtain relief, Endurance must show that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if injunctive relief is not issued. *Life Spine*, 8 F.4th at 545. Inadequate "does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Id.*, *quoting Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003).

In this case, Endurance asserts that it has been and will continue to be irreparably injured by Ascent's actions because of the likelihood that customers associate "any quality or customer service problems related to [Ascent's] products" with Endurance, resulting in "damaged goodwill," "lost sales," and overall "decrease[d] . . . distinctiveness" of the Apex Trademarks. (Dckt. #22 at 18–19). Endurance asserts that it has "invested heavily in and succeeded in establishing its reputation and goodwill in its own brand name," and that Ascent's actions pose "manifest and imminent" harm to Endurance because it has "no control over the quality and customer care provided by [Ascent's] competing products." (*Id.* at 19–20). Ascent, on the other hand, argues that Endurance's claims of irreparable harm are merely speculative, with no evidence of "actual sales diversion, diminished brand value, . . . actual confusion, [or] lost customers." (Dckt. #28 at 15–16).

The parties agree that Endurance is entitled to a rebuttable presumption of irreparable harm upon this Court's finding that it has a likelihood of success on its trademark infringement claim, (Dckt. ##22 at 10; 28 at 15), and Ascent fails to overcome this presumption. Its argument that Endurance offers no "concrete" evidence of actual confusion is incorrect: as Ascent notes, Endurance received multiple inquiries confusing Ascent's products with Endurance's. (*See* Dckt. #28 at 15). Moreover, it is "well established" that the loss of goodwill and reputation can constitute irreparable harm. *Life Spine*, 8 F.4th at 546; *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012). This is the case even where the trademark owner offers no evidence that it has lost sales or market share. *See, e.g.*, *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001); *Wesley-Jessen*, 698 F.2d at 867; *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 908–09 (7th Cir. 1986); *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025–26 (7th Cir. 1979); *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank*, 383 F.3d 110, 131

(3d Cir. 2004). Because it is not practicable to calculate damages to remedy this kind of harm, no remedy at law can adequately compensate Endurance for its injury. 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §2948.1 (3d ed. 2002 & April 2021 Supp.) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable."). Indeed, irreparable harm "is generally presumed" in trademark infringement cases. *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000).

Ascent further asserts that Endurance is barred from obtaining injunctive relief because it delayed in seeking it, even if Endurance *had* presented concrete evidence of irreparable harm. In particular, Endurance learned of the alleged infringement "in the middle of 2025, yet this litigation did not commence until January 2026." (*Id.* at 16). This argument, too, is unavailing. "[D]elay is only one among several factors to be considered," *Ideal Indus.*, 612 F.2d at 1025, and in any event, delay "is only relevant to the extent that [the movant] lulled [the non-movant] into a false sense of security." *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F.Supp.2d 868, 887–888 (N.D.Ill. 2008). No such lulling took place. As plaintiff points out on reply, any delay in bringing suit arose as a result of Endurance's efforts to first engage directly with Ascent, including through the issuance of a cease-and-desist letter as early as September 2025. (Dckt. ##22 at 7; 33 at 12).

Accordingly, the Court finds that Ascent has not rebutted Endurance's presumption of irreparable harm.

## VI. The Balance of Equities and the Public Interest

Finally, the Court considers the balance of equities between the parties and the effect of the requested relief on the public interest. Before ruling on a request for injunctive relief, courts must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

26

7, 24 (2008). This includes "particular regard for the public consequences" should the preliminary injunction be issued. *Winter*, 555 U.S. at 24. Generally, enforcement of trademark law is in the public interest because it prevents consumer confusion. *See Eli Lilly*, 233 F.3d at 469.

Endurance argues that the balance of equities tips in its favor because it will lose profits, reputation, and goodwill that it built by investing in its brand for more than a decade. (Dckt. #22 at 20–21). Ascent, to the contrary, argues that the balance of equities tips in its favor because a preliminary injunction would disrupt existing contracts and dealer relationships. (Dckt. #28 at 16–17).

Here, the balance of equities weighs in favor of issuing a preliminary injunction. Because Endurance's "likelihood of success on the merits is not slight," the balance of harms need not weigh extraordinarily its favor. *Ty*, 237 F.3d at 903. And the Seventh Circuit has repeatedly discounted the potential harm that alleged infringers claim where they had "full knowledge" of a senior user's trademark and still chose to "proceed[] in the face of a known risk." *Id.*, at 903–04; *Wesley-Jessen*, 698 F.2d at 867. While Ascent might face disruption to its business operations, the Court will not prioritize its continued use of an allegedly infringing mark—one that Ascent has used for a fraction of the time that Endurance has used the Apex Trademarks—over protecting Endurance's marks and goodwill.

The public interest also favors the grant of injunctive relief. Enforcement of trademark law serves the public interest by reducing consumer confusion. *See Eli Lilly*, 233 F.3d at 469. "Thus, in trademark cases, the public interest almost always favors granting otherwise appropriate injunctions." *Polar Corp. v. PepsiCo, Inc.*, 789 F.Supp.2d 219, 240 (D.Mass. 2011).

Endurance has made a showing of a likelihood of consumer confusion; that is enough to demonstrate that the public interest weighs in favor of entering an injunction. *See id.*

## VII. Bond

Pursuant to Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). "The amount of a bond is a determination that rests within the sound discretion of a trial court." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed.Cir. 2006); *see also Monster Energy Co. v. Wensheng*, 136 F.Supp.3d 897, 910 (N.D.Ill. 2015). Waiver of the bond requirement is within the Court's discretion, but it is "a dispensation narrowly construed in this circuit." *Coyne-Delany Co., Inc. v. Capital Dev. Bd. of State of Ill.*, 717 F.2d 385, 391 (7th Cir. 1983). "Normally an injunction bond or equivalent security is essential" because a party "injured by an erroneous preliminary injunction is entitled to be made whole," *Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*, 646 F.3d 424, 428 (7th Cir. 2011), and indeed, the Seventh Circuit has directed courts to "err on the high side" when setting the amount of a bond, *Auto Driveaway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d 670, 679 (7th Cir. 2019), *quoting Mead Johsnon & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000).

Plaintiff asks that the Court require no bond at all, arguing that this situation is akin to one in which "there is no danger that the opposing party will incur any damages from the injunction." (Dckt. #22 at 22) (citing *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010)). Defendant disagrees, arguing that it would suffer significant damages if wrongfully enjoined. (Dckt. #28 at 18). Neither party addresses in what amount any bond should be set, should the Court grant injunctive relief.

28

The Court agrees with Ascent that here, where there are no "extraordinary circumstances," the Court should grant defendant's bond request. *Reinders Bros., Inc. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980). In the absence of any particular argument by the parties about the amount, the Court will require Plaintiff to post a $10,000 bond, which the Court finds appropriate based on this record and prior persuasive decisions. *See, e.g.*, *Monster*, 136 F.Supp.3d at 910–11 (listing cases); *Ty Inc. v. Pop Mart Ams. Inc.*, No. 1:26-CV-00463, 2026 WL 1649325, at *8 (N.D.Ill. June 8, 2026) (granting a $10,000 bond for a similar alleged trademark infringement action); *see also Whirlpool Corp. v. Shenzhen Sanlida Electrical Tech. Co., Ltd.*, 80 F.4th 536, 542 (5th Cir. 2023) (same); *Island Saints LLC v. Cardow, Inc.*, No. 3:24-CV-0051, 2024 WL 4564520, at *11 (D.V.I. Oct. 24, 2024) (same). The Court further finds this relatively low bond amount "appropriate given the strength of [Endurance's] trademark infringement cause of action . . . and the parties' shared motivation to resolve this matter expeditiously," as evidenced by their earlier and ongoing settlement conversations. *Am. Dairy Queen Corp. v. UAM, LLC*, No. 5:24-CV-01209-JKP, 2024 WL 4876151, at *2 (W.D.Tex. Nov. 22, 2024).

Ultimately, however, "[t]he burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm it will suffer from a wrongful restraint." *Monster*, 136 F.Supp.3d at 911. Accordingly, should Ascent consider a $10,000 bond insufficient, it may move the Court to increase the amount of security so long as the injunction is in effect, provided that it supplies sufficient evidence or authority to justify the increase. *See, e.g.*, *see Unicolors, Inc. v. Shewin Flagship Shops*, No. 1:24-CV-02987, 2024 WL 5438757, at *2 (N.D.Ill. Nov. 26, 2024) ("The enjoined party seeking an increase in the amount of a bond bears the burden of justifying the increase.") (cleaned up).

29

## CONCLUSION

For the foregoing reasons, Endurance's motion for a preliminary injunction is granted.

(Dckt. #21). Endurance is directed to provide a draft preliminary injunction order to the Court's

proposed order mailbox, Proposed_Order_Cummings@ilnd.uscourts.gov, in WORD format by

4:00 p.m. on June 25, 2026.


**DATE: June 24, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**

30